DOYLE (Receiver) v GIFFORD (Admx).

Ohio Appeals, 7th Dist, Mahoning Co

No 2477. Decided October 21, 1938

McKain, Ohl & Swanner, Youngstown, for plaintiff-appellee.

Barnum, Hammond, Stephens & Hoyt, Youngstown, D. W. Mumaw, Youngstown, and R. J. Nicholson, Youngstown, for defendants-appellants.

## OPINION

By BENNETT, J.

This case is a contest between three claimants to the proceeds of a life insurance policy in the amount of $10,000 upon the life of Charles A. Gifford. The policy was issued on May 21, 1921, naming The Youngstown Glass & Paint Company as beneficiary. Gifford was the president of that corporation at the time and continued as an officer of the corporation and an employe of its receiver until shortly before his death, which occurred on December 2nd, 1932. The corporation paid the only premiums which were ever paid on the policy, being perhaps five in number. Thereafter, for several years prior to the death of Charles A. Gifford, no premiums were paid and the general assumption on the part of those in any way interested at the time of his death was that the policy had lapsed and was of no value. However, in the meantime, the corporation had gotten into serious financial difficulties, and on May 1st, 1931, H. B. Doyle was appointed as its Receiver by the Common Pleas Court of Mahoning County. The Receiver sold certain assets of the corporation at receiver's sale on June 23, 1931, and one of the questions in the case is whether or not the interest of the corporation in the policy was sold at that sale. The purchaser of these assets was W. P. Redden, an officer of the corporation's largest creditor, a Youngstown bank.

He then transferred these assets, which he had thus acquired, to a new corporation, The Youngstown Paint and Glass Company.

For sake of brevity, as well as to avoid confusion from the similarity of names, we will follow counsel in referring to the former corporation as the Glass Company, and to The Youngstown Paint and Glass Company as the Paint Company.

For two years after the death of the assured no one paid any attention to the policy. It was then discovered that it had been in force at the date of death, despite several years default in payment of premiums, by reason of its "paid-up" insurance provisions, and this three-cornered dispute for the proceeds then arose. The Receiver in the meantime, on November 24, 1934, had been discharged, after having supposedly liquidated the estate and having been able to pay creditors only 2.46 cents on the dollar. An application to reopen the receivership was filed and granted. The Receiver of the Glass Company claims the proceeds of the policy on the theory that he had never sold or disposed of the policy, the Paint Company claims the money on the ground that they had purchased the policy at the Receiver's sale, and the Administratrix of Charles A. Gifford bases her claim on the ground that, by the terms of the policy, the proceeds were payable to the estate of the insured in the event that the latter "survived" the named beneficiary, which was the Glass Company. Her claim is that Charles A. Gifford "survived" the Glass Company, because of the fact that its Articles of Incorporation had been cancelled by the Secretary of State on November 15, 1932, for failure to file returns and pay franchise taxes, and the fact that it had become hopelessly insolvent and had failed to perform any corporate function for a long time prior to the death of Charles A. Gifford. At the date of death the receivership was not operating in any manner but had not been closed because the funds of the Receiver were in a closed bank.

After the Receiver's reappointment he filed this action against the Travelers Insurance Company and the Paint Company to recover the proceeds of the policy. The Insurance Company interpleaded Redden and the Administratrix of Charles A. Gifford and then paid the proceeds of the policy into court. The trial court found the Receiver to be entitled to the money and from its decree appeals have been taken on questions of law and fact by the Paint Company and by the Administratrix.

We will first discuss the merits of the

dispute as to ownership of the policy which arises from the Receiver's sale of the assets of the Glass Company to Redden.

The interest of the Glass Company in the policy came in two arguable ways. The corporation of course paid all the premiums and is named as beneficiary in the first sentence of the policy. The insured had also made an assignment of the policy to the Glass Company, which was dated May 28, 1921, one week after the date of the policy itself.

The claimants all assert that they are relying upon the court orders and proceedings alone, as the basis of their position on this question, but each has offered testimony as to the beliefs and understandings of the parties to the sale, in the event that any of such testimony should be relevant. The Receiver denied that he personally knew anything about the policy. It was not listed as an item of the inventory which he prepared and filed with the court. We have found no testimony in the record that Redden, the purchaser, knew anything about it. There is some testimony that the men interested in the Paint Company were interested in Redden's purchase of these assets at the time of the Receiver's sale. The Giffords and their attorney knew of its existence.

Although the policy was not listed in the inventory of the assets, two of the appraisers knew of its existence and one said he had considered it as one item in the appraisal of an account owed to the corporation by Charles A. Gifford which they appraised at zero. The actual surrender value of the policy at the time was $622.71, although no one knew this. How this policy on the life of Charles A. Gifford, bought and paid for by the corporation, could be considered collateral to his debt, is not clear to me. In any event, it was not listed nor appraised at zero or any other figure. The policy itself remained among papers of the Glass Company taken into possession of the Paint Company until the death of C. A. Gifford. A. W. Gifford then turned it over to Mrs. C. A. Gifford. He got it back from her some two years later when it was discovered that it had been in force at date of death and was worth $10,000. Immediately the piece of paper, which had been kicked around as valueless for four years, became the center of the scramble which is now before us.

There certainly was no discussion about it between the Receiver and the buyer, or the purchaser from the buyer, at or prior to the time of sale. No written assignment to the purchaser or to his transferee was ever made or endorsed on the policy, with or without the approval of the Insurance Company. The policy had not been carried on the books of the corporation as an asset having any value, and did not appear in the balance sheet figures.

The Receiver's application for authority to sell recites that he has had the inventory and appraisal made in accordance with the order of the Court, and "that it would be for the best interests of the estate to sell all of the assets of said corporation at public sale" to be "conducted as follows: First: The stock, fixtures, book accounts, corporate name, franchise and good will, the foregoing meaning to include all assets save and except real estate."

The order of sale made by the Common Pleas Court on June 11, 1931, first approved the inventory and appraisal. The court then found "that it will be for the best interests of this estate to sell all the assets promptly" and ordered "said sale" to be held on Monday, June 22, 1931, at the Receiver's office. Notice to all creditors and advertisement by three insertions in the Daily Legal News was ordered and Journal Entry then continued.

"It is further ordered that said sale shall be conducted as follows:

First: The stock, fixtures, book accounts, corporate name, franchise and good will, the foregoing meaning to include all assets save and except real estate, be first offered. * * * *

Said sale to be made to the highest bidder, as aforesaid, subject to the approval of the Court."

On June 23, 1931, the Receiver reported to the Court as follows:

"Now comes Harold B. Doyle, Receiver herein, and respectfully represents that under and in accordance with the former orders of the Court, he offered the following property, both real and personal, for sale at public auction; that there was bid therefor the amounts hereinafter set forth:

First: That the stock, fixtures, book accounts, corporate name, franchise and good will was offered for sale, and he received a bid from William P. Redden, in the sum of $12,000 which was the highest bid therefor and the same was sold to the said William P. Redden, subject to the confirmation of this Court."

The Receiver then asked for confirmation and that he be authorized to execute and deliver a bill of sale to W. P. Redden "for the assets included in item First herein."

The legal notice of the sale published pursuant to the order of sale read:

"all stock, fixtures, equipment, book accounts, corporate name, franchise, good will and other assets of The Youngstown Glass and Paint Company as shown by the inventory on file in this case."

The order of confirmation of the sale reads as follows:

"all that certain stock of goods, merchandise, fixtures and all property of every nature and description purchased at Receiver's sale from Harold B. Doyle, Receiver of The Youngstown Glass and Paint Company, under date of June 22nd, 1931."

Receiver Doyle then executed a Bill of Sale reading as follows:

"For and in consideration of the sum of Twelve Thousand Dollars ($12,000), receipt of which is hereby acknowledged, and acting under and by virtue of the authority vested in me by the Court of Common Pleas, Mahoning County, Ohio, I hereby sell, transfer and assign all my right, title and interest in and to the stock of goods, merchandise, fixtures, book accounts, corporate name, franchise and good will, all as of the date of the confirmation of this sale to WILLIAM P. REDDEN of Youngstown, Ohio."

The crux of this part of the case, therefore, narrows down to this—the only paper, in what we may call the chain of title of the Paint Company, which refers specifically to the inventory is the advertisement. Some of these documents, viz., the Application to Sell and the Order to Sell refer to the sale of all of the assets except real property; others, viz., the Return of Sale and the Bill of Sale, do not use the word "all" but refer to various classes of assets, not including insurance, but being the same named assets which the Receiver had named in the Application to Sell and as to which he said, "the foregoing meaning to include all assets save and except real estate."

The Receiver argues that he obviously could not have sold what he didn't know existed and that there never could have been a meeting of the minds on the sale of the policy for that reason. So far as a meeting of the minds is concerned, he also argues that the purchaser's "mind" never consciously included this policy because they all assumed it of no value if it crossed their minds at all and the action of Mr. A. W. Gifford in turning it over to Mrs. C. A. Gifford, on the death of her husband, indicated an understanding on his part that the paper, worthless or not, did not belong to the company of which he was the head.

The conclusion to which we have come is made less easy by the fact that our Ohio statutes governing receiverships are very sketchy and contain no specific requirements relative to inventory and appraisement, as does the Federal Bankruptcy Act. This weakens greatly the authority of the bankruptcy cases relied upon by the Receiver such as

Appling v Minarets and Western, 230 Pac., 1029.

In re Butler Cando Company, Inc., 8 Fed., (2) 311.

Cook v Teitelman, 120 Atl., 548.

We must concede that, in the abstract, the Receiver intended to sell all of the assets of the corporation and that, in the abstract, the purchaser thought he was buying all of its personal property. On the other hand, we find as a fact that the Receiver did not know of the existence of the policy, to say nothing of its having any value, and, while some of the individuals acting for the purchaser and the assignee of the purchaser, may have known of the existence of the policy, they looked upon it as so much waste paper. Certainly not one cent more was bid at the sale by reason of any expectation of getting this policy which was neither inventoried nor appraised. It could not have been considered in making the bid, either as a right of then present worth or of contingent value.

If the purchaser is to receive the policy it will be simply a windfall which he never consciously bargained to purchase or pay for. It will be a windfall for the Receiver also, if he gets it, but it will be a windfall which rightly belongs to the creditors whom he represents, unless he had in fact theretofore disposed of it. An argument on the purchaser's behalf is that he consciously bid for the catch all of the odds and ends of personal property which were too unimportant to list as individual items and that, if he was fortunate enough to have picked up a diamond in the rubble, it was his good luck. Such a principle we believe would be applicable to a transaction between individuals. But we do not believe that it is applicable to a judicial sale. While it is true that our receivership statutes are sketchy, nevertheless the policy of requiring inventories and appraisals is common practice in this state, as elsewhere, and this practice is based on the common sense necessities of the situation. The court, and its officer, the Receiver, are administering the assets of the estate for the benefit of all

those interested. The inventory and appraisal are had to enable the court to have an advised and informed judgment respecting proposed sales, as well as to inform creditors of the condition of affairs and also to encourage ·bids by supplying information to prospective bidders as to what will be for sale. We do not say that inventories must be ridiculously minute and that it is impossible or improper to lump unimportant odds and ends into a miscellany, but we do say that, in general, the policy of the law must be that judicial sales can only be sales of known assets and do not include a general gamble of "whatever else the insolvent estate may contain, whether we know of it or not." We believe that after the court had ordered the inventory and appraisal and had received it as a basis for action in the premises, the various documents involved in the sale should be construed as referring to the inventoried estate and the use of the words "all the assets" in the Order of Sale should be limited in the nature of things to the only assets with which the court would believe it was dealing.

"One of the characteristics of a judicial sale is that the court's decree of sale acts upon specifically described property."

Ohio Juris., Judicial Sales, §15, 16 R. C. L. page 23, §18.

The rule of "Caveat Emptor applies in all its rigor to judicial sales" and the "purchaser at a judicial sale is charged with the duty of ascertaining for himself the character and condition of the property." O. Jur., Judicial Sales, §130.

The notice and advertisement which in terms limited the sale of the inventory, is in this purchaser's chain of title. But, beyond that, we believe that the order of sale and confirmation are premised upon the inventory and, despite their broader language, should not be construed to include a gamble upon unlisted property not known to court or receiver to exist.

It is argued that certain fire insurance policies were not inventoried but were transferred to the Paint Company. This is said to show the real intent of the parties to the transaction. Perhaps it does, but in our opinion, that transfer may also have been improper. A judicial sale must be an "informed" sale and not a gamble on unknown assets.

Nor are the equities between the parties unfavorable to the claims of the Receiver. Charles A. Gifford and A. W. Gifford were the managing officers both of the Glass Company and of the Paint Company after the transfer of the assets to the latter. In the interim they were employed by the Receiver. One of the directors of the Glass Company was the attorney for the company, became a director and attorney for the new company, and was also attorney· for the bank, one of the largest creditors of the Glass Company. His firm also acted as attorney for the Receiver. Negotiations of some sort between the bank and the Giffords, relative to continuing the business, preceeded the sale. The Giffords, at least, were interested in acquiring the assets at the sale. There is a dispute between A. W. Gifford and the attorney as to what transpired. Gifford says that the attorney represented him and bid at the sale for him and had him remain in another room from that in which the bidding was to take place. The attorney denies this and testified that he represented the bank and bid for the bank. The bank's bid of $12,000 was accepted. Immediately thereafter a new corporation bought the assets from the bank in consideration, (1), of issuing 998 shares of the stock to A. W. Gifford, one share to Charles A. Gifford, and one share to the same attorney, and (2) of the assuming and agreeing to pay the debts of the Glass Company to the bank in the amount of some $36,000, if we correctly understand the record. The much discussed "Paint and Glass Company's Exhibit 1" would look as if the total to be paid was $48,050. The Paint Company over a period of years since that time has paid these debts in full, part of the payments having been made in cash and part of them in Mutual Holding Company Pass Books, accepted by the bank in liquidation of the obligation. The dividend paid by the Receiver to other creditors was 2.46 cents on the dollar.

We confess we are not able to understand all of this testimony, for instance whether the Paint Company paid $36,000 or $48,000, and it is perhaps not very important. But it does seem to the court that the net result of Mr. Gifford's testimony relative to the bidding, the organization of the new company, the quadruple representation by the attorney and the price which his company paid, as compared to that which the Receiver received, to all of which matters Gifford was in some degree a party, would at least indicate that the Receiver may have suffered from the manner in which the matters were handled. At least, until these matters which do appear in the record are

more thoroughly explained away than they now are, we do not believe that it lies in the mouth of the Paint Company to ask the Receiver to give more than he already has given for the $12,000 which he received.

24 O. Jur., Judicial Sales, §§72, 74 and 75; and 395, et seq.

The second question is that between the Estate of Charles A. Gifford and the Receiver.

We join with counsel for the Receiver in paying tribute to the industry of counsel for the Administratrix in the preparation of the brief which he has filed in this case. It has been so well done that it is almost with regret that we are compelled to find against him. But we believe that the terms of the contract are so clear that there can be no question about the result.

The Insurance Company, in the first sentence of the policy, agrees to pay the $10,000 to "The Youngstown Glass and Paint Company, beneficiary of the insured, immediately on receipt of due proofs of death."

The policy was also assigned by the assured to the Glass Company on May 28, 1921, the assignment reading as follows:

"FOR VALUE RECEIVED, I hereby assign, transfer and set over unto THE YOUNGSTOWN GLASS & PAINT COMPANY of Youngstown, State of Ohio, their successors or assigns, all my right, title, claim, interest and benefit in and to the Contract of Insurance issued by THE TRAVELERS INSURANCE COMPANY, Hartford, Connecticut, on the life of Charles Andrew Gifford and numbered 725655 with the right to such assignee to exercise any and all options, rights and privileges in said contract given to the insured and/or beneficiaries or assignees hereby agreeing that all acts and things done and releases and discharges given by said assignee under this instrument shall be as binding and as effectual as if done or given by the undersigned personally."

This assignment was endorsed on the policy by a rider glued to it.

The chronology thereafter, to repeat, was that the receiver was appointed on May 1, 1931, the sale of assets occurred on June 23, 1931. Mr. Gifford died on December 2, 1932.

Counsel for the administratrix argue that, despite the assignment, payment after death is controlled by terms of the beneficiary clauses, that the terms of this policy include the provision that if the insured shall survive the Beneficiary the proceeds are payable to the estate of the insured, and that

the Glass Company, the beneficiary had died or been "survived" by Charles A. Gifford by reason of the facts that its charter had long since been cancelled, it had not performed a corporate act in years, it was completely insolvent, its functions had been taken over by the Court and its Receiver, and even its name and franchises had been sold and purchased by the other two parties to this case. He relies upon Dorset v Thomas, 92 So., 734, (La.), as the authority most closely in point. Counsel for the other parties argue on the question of the "death" of the Glass Company, that it still had certain functions left and was still in existence for certain purposes, as provided in §§8623-30 GC, and §5511, GC, Vol. 144 Corpus Juris, Page 1168, §3835. The question as to whether C. A. Gifford "survived" the Glass Company, within the meaning of this clause in the policy, would be a difficult one if we were relegated to that matter alone, because of the fact that the clause obviously was drafted with reference to human beings and an attempt to attribute an "intention" to the parties to the contract would have to be entirely artificial. It was a clause printed in the policy and not drafted for this individual contract, and obviously the parties had never devoted any real thought to its meaning with reference to the circumstances that did develop.

But we believe that it is entirely unnecessary to speculate on this question because the ultimate disposition of the money is, in our opinion, determined by other language of the policy which would give the proceeds to the Receiver, even if the insured had "survived" the Glass Company in the technical sense claimed by counsel.

The clause on which the administratrix relies is the last sentence of the following paragraph:

"CHANGE OF BENEFICIARY. — SUCCESSION.—Provided this contract is not assigned, the Insured may at any time and from time to time during its continuance change the Beneficiary, to take effect only when such change and the written consent of the Company thereto are indorsed upon the contract at the Home Office of the Company, or attached thereto, whereupon all rights of the former Beneficiary shall cease. If the Insured shall survive the Beneficiary or Beneficiaries or any of them named herein, the proceeds of the contract or the share of the deceased Beneficiary or Beneficiaries, as the case may be, shall be paid to the executors, administrators or assigns of the Insured, unless otherwise provided in or by indorsement upon this contract."

608

It will be noted ·from the language of the Assignment that the insured, who by the terms of the policy had theretofore had the authority to change the beneficiary, not only assigned "all my right, title, claim, interest and benefit in and to the contract", but that the assignment continues "with the right to such assignee to exercise any and all * * * rights in said contract given to the assured and/or beneficiaries."

Remembering that this policy on the life of Charles A. Gifford was taken out by the corporation, that it paid all of the premiums which were ever paid, and that it, to use a layman's word, was the "owner" of the policy, it is easy to understand why the language of the assignment should be as clear as it seems to us that it is, on this question. In the first place, the Insured, and after the assignment the assignee, had complete power to change and to name the beneficiary. In the next place the above quoted language in the assignment clause gives to the assignee not only the rights of the assured in the policy but also those of the beneficiaries.

"Where, with the consent of the insurer, the insured in a life policy assigned the same, the assignment purporting to convey all right, title and interest of the insured and all beneficial advantage to be derived from the policy, there was a change of beneficiary, as much as if there had been a substitution of the assignee for the beneficiary in that part of the policy in which the name of the beneficiary appeared."

Atlantic Mutual v Gannon, 179 Mass., 291, N. E., 60 N. E., 933.

And in the last place the beneficiary clause on which the administratrix relies does not provide that the proceeds shall go to the estate if the Insured survives the named Beneficiary, but that they shall go to the "administrators or assigns" of the Insured. Which can only mean, it seems to us, to the assigns of the Insured it an assignment has been made by him, or to the estate of the insured, if not.

Grigsby v Russell, et al Adm, 222 U. S., 149, 35 S. Ct., 58.

Prudential v Liersch, 122 Mich., 438, 81 N. W., 258.

Cases relied on by counsel for the administrator, such as Anderson v Broad Street Bank, are clearly distinguishable because of the difference in the language of the clauses in the policy, and the authority in the United States is far from unanimous even as to the principle of that case. See

Merchants Bank v Garrard, 158 Ga., 887, 124 S. E., 715, and the note in 38 A. L. R., 109.

No question as to insurable interest in the assignee or its Receiver can be raised in Ohio.

Eckel v Renner, 41 Oh St, 232.
Keckley v Coshocton Glass Company, 86 Oh St, 213
Grigsby v Russell, Admr., 222 U. S. 149.

Nor are the cases under Sec. 70(a) of the Bankruptcy Act in point as to any limitation in the right of the Receiver to the amount of surrender value. In the first place, these cases all depend upon the specific terms of the Bankruptcy Act. In the second place, all but two of them are cases of policies on the life of the bankrupt and owned by the bankrupt. The case of Burlingham v Crouse, 228 U. S., 459, is the first exception noted to this last statement, as the policy in question on the life of McIntyre had been absolutely assigned to his partnership. We believe that the crux of the case on this phase of the matter is contained in the assertion of the court in the second from last paragraph, "but we find nothing in the act by which the rights of the assignee of the policy to the benefits which would have accrued to the bankrupt is limited." In other words, under that act the assignee got whatever statutory benefit the Act gave the assignor. The second case is Curtis v Humphrey, 78 Fed. (2) 73. The writer personally would agree with the doubts of Judge Sibley, but, in any event, the most that can be said for these two cases is, as he phrased it, that they "yield to the literal words" of the Bankruptcy Act.

Whether or not, as contended by the Administratrix, the Glass Company had died or been survived by C. A. Gifford, under the provisions of that clause of the policy, we are convinced that it "continued" for the purpose of paying "existing liabilities and collecting its assets and doing all other acts required to adjust, settle and wind up its business", as provided in §8623-80, GC, and we believe and hold that it has sufficient corporate existence that its Receiver, in its behalf, may collect the funds to which we believe it entitled under the argued clauses of this policy.

A decree, including findings of fact and conclusions of law, may be drawn in accordance with the opinions herein expressed.

NICHOLS, PJ, & CARTER, J, concur.